# CASES DETERMINED

IN THE

# SUPREME COURT OF ARKANSAS

BILLINGSLEY *v.* ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY.

## Opinion delivered October 21, 1918.

RAILROADS—INJURIES AT CROSSINGS—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.—Where the evidence tended to prove that plaintiff's intestate stopped his team near a crossing in front of an approaching train, and that his mules became frightened and ran in front of the train, which had given no signals, it was error to direct a verdict for the defendant railroad company; it being a question for the jury whether intestate was negligent.

Appeal from Lawrence Circuit Court, Eastern District; *Dene H. Coleman,* Judge; reversed.

### STATEMENT OF FACTS.

On the 10th day of April, 1917, Lewis Billingsley, while attempting to drive his wagon and team across the tracks of the St. Louis-San Francisco Railway Company at a public crossing in Hardy, Arkansas, was struck by an eastbound passenger train belonging to said railway and was killed. This is a suit by his widow and minor child to recover damages for his death which is alleged to have been caused by the negligence of the defendant.

The railroad company answered, denying negligence on its part and alleging contributory negligence on the part of Lewis Billingsley. The facts and circumstances connected with his death are substantially as follows:

Lewis Billingsley was twenty-four years of age at the time of the accident, and was a strong energetic young

man.  He was at the time, and had been for three years, a drayman in the town of Hardy, Arkansas.  It was his custom to meet every train for the purpose of hauling to and from the station express and other freight.  He was driving a pair of mules at the time of the accident, and had been using them in the dray business for a year and a half.  They were gentle and accustomed to being driven around cars.  The railroad runs in a general direction east and west through the town of Hardy.  The main business portion of the town is situated north of the railroad tracks on an elevation overlooking the tracks. Both the freight and passenger depots are situated on the south side of the railroad tracks.  Main Street, on which most of the business of the town is conducted, runs east and west north of the tracks and is a block away.  There is a road between the passenger depot and the freight depot extending northward into the main business portion of the town.  It crosses the main track and two side tracks situated immediately north of the main track. This public crossing is the one over which most of the travel passes.  The passenger depot is just east of this public crossing, and the freight depot is west of it.  There is a warehouse sixty feet wide and one hundred and fifty feet long situated on the lot north of the railroad track and west of the public crossing.  There was a concrete sidewalk extending north and south just east of the warehouse.  At the time of the accident there were three box cars standing on the commercial track just south of the warehouse and next to it.  They were 14 feet west of the sidewalk.  There was a passing track between the commercial track and the main track. The distance between the commercial track and the passing track is 8 feet, and the distance between the rails is five feet, and there is nine feet between the passing and main track, making a distance of 14 feet between the north rail of the commercial track and the north rail of the main line.  There were also box cars stored on the commercial track just west of the crossing.  The street which extended over the crossing

was fifty feet wide, but the traveled part over the cross-
ing was only fourteen feet in width. The surface of
Main Street was rocky, and rock had been laid on the
street down to the public crossing; but for 150 feet be-
fore reaching the crossing, cinders had been put on the
rocks and from the constant travel had been made into a
hard smooth surface over which vehicles would roll with
but little noise. Billingsley was killed by an east-bound
passenger train about three o'clock in the afternoon.
At the time there was a freight train which had come
in from the east, and was on the passing track waiting
for the passenger train which was coming in from the
west. The passenger train was about forty-five minutes
late. Just before he was killed the plaintiff had hauled
a load of freight from the depot to a mill situated on the
street just north of Main Street and some distance east
of the street extending over the crossing in question.
After unloading his freight, he started back towards
the depot. He met his brother and another drayman on
Main Street about 250 feet east of the street running
north and south over the public crossing above referred
to. He stopped and talked with these persons for a min-
ute or two, and then drove on down Main street towards
the depot. Main street was rocky along where Billings-
ley was driving after he left the persons just referred to.
Just after he left them, these persons heard a train com-
ing from the west blow its whistle for the station. It
was accustomed to blow its whistle for the station a mile
away. In a few moments' time this train struck the
wagon and team of Billingsley, and he was hurled from
the wagon with such force that he was instantly killed.
One of the mules was also killed, and the wagon was de-
molished. The rate at which the train was running was
variously estimated by the witnesses who saw it at from
15 to 35 miles per hour. Some of them said that it was
running very fast, faster than usual, and that they
thought it must be one of the fast trains which did not
stop at Hardy. Some of the witnesses testified that Bil-

lingsley was driving in a fast trot as he approached the crossing. They said he was traveling something like six miles an hour, and the train was running five times that fast; that he was about 20 feet from where he was struck and the engine was about 100 feet from the crossing when they first observed him; that Billingsley first looked towards the east along the track and then turned towards the west; that he was stooping over and had his hand on the brake and the wagon lines in his left hand; that he checked the mules, and it seemed as if they would stop; that the mules began to lunge, and one of them had his head across the main track and the right fore-wheels of the wagon were on the main track at the time the engine struck them; that it was all done so quickly that it was hard to describe the relative positions of the wagon and team and engine accurately. These witnesses testified that the statutory signals for the crossing were not given; that they neither heard the bell ring nor the whistle blow for the crossing. Some of the witnesses testified that the bell was ringing at the time the train struck Billingsley, but that it had only just commenced to ring. Some of the witnesses testified that the train was coming unusually fast and made very little noise; that neither the bell was rung nor the whistle blown; that they were near the scene of the accident and would have heard these signals had they been given. One witness testified that he heard some one halloo at Billingsley, and that he looked around and saw the mules stop within six or eight or maybe ten feet of the main line; that they stuck their front feet in the ground stopping the wagon; Billingsley stopped with his hand on the brake and with the lines in his left hand; that the train was within 150 or 200 feet; that the mules began to spring and one of them got across the main track and jerked the hub of the front wheels onto the main track and the train struck them.

On the other hand witnesses for the defendant testified that Billingsley made no effort to stop his team at

the time of the accident; that he was driving at a fast trot as he approached the crossing and continued to do so until the train struck him; that the train whistled for the crossing and that the bell was rung from then until the train struck the wagon.

According to the testimony of the engineer and fireman they did not remember about giving the statutory signals for the crossing, but their report showed that they had given them. They made every effort to check the speed of the train after they saw Billingsley, but were unable to do so. Other evidence will be stated or referred to in the opinion.

At the conclusion of the testimony, the circuit court directed the jury to return a verdict for the defendant. From the judgment rendered the plaintiff has appealed.

*David L. King,* for appellant.

1. It was error to direct a verdict. A clear case was made for a jury of negligence. The instructions submitted for appellant should have been given. There was a question about which different conclusions might be drawn. 97 Ark. 347; 81 *Id.* 187; 95 *Id.* 15; 86 *Id.* 183.

2. The rule "*res ipsa loquitur*" applies, the injury at the crossing being admitted. No contributory negligence was shown. 11 Am. Cas. 111. Facts about which honest men might differ as to the conclusion to be drawn make a case for a jury. 17 Wall. 665.

3. Carelessness and negligence were shown. It is a railroad's duty to keep approaches to its crossings in good condition and the view unobstructed. K. & C. Dig., § § 3285 to 8243, 8240; 6 Ann. Cas. 71; Ann. Cas. 1913, B. 964.

4. A failure to stop, look and listen is not always required but excused where one is misled by failure of the company to discharge its duty. 52 S. E. 940; 66 Fed. 502. Where plaintiff exercises ordinary care the question as to carelessness is for the jury. 105 Ind. 404; 122 Mo. 533; 89 Hun, 596; 68 Miss. 589. See also 96 Ark.

638; 29 Cyc. 655, 516; 111 Ark. 134; 100 *Id.* 527; 105 *Id.* 392; 124 *Id.* 413; 20 Am. Ann. Cas. 1200.

5. Reasonable care may be shown by circumstances as well as by direct evidence. It can not be said as matter of law here that plaintiff was guilty of contributory negligence. 174 Ill. 495; 91 Am. St. 543; R. C. L. 100; 135 Am. St. 821; 125 *Id.* 161; 15 L. R. A. (N. S.) 254; 74 N. E. 34. The questions of negligence and contributory negligence under the evidence here were questions of fact for a jury. Ann. Cas. 1913, A. 49; 92 N. E. 337; 116 N. C. 720; 21 S. E. 550; 47 Am. St. 823. Plaintiff was only required to exercise the care of the average individual. While he must exercise vigilance to discover and avoid danger, he is excused where the proof shows that defendant owed him a duty of care upon which he relied. See R. C. L. 100-1; 131 Ind. 528; 66 N. H. 200; 11 L. R. A. 364; 66 Fla. 286; 44 L. R. A. 815.

6. Here there was wilfulness, wantonness and recklessness on part of the driver of the car. 89 Am. Dec. 467, 883; 26 Ind. 370; Ann. Cas. 1912, A 491 and notes. The question of negligence, proximate cause, contributory negligence, etc., were all questions for a jury. 28 Kan. 441; 10 M. & W. 548; Ann. Cas. 1912, A 471; 101 Fed. 936; 69 Ark. 380; 22 Ann. Cas. 495; 15 L. R. A. (N. S.) 819; 25 Ann. Cas. 454, note; 47 Mich. 1; 117 Ark. 457; 87 *Id.* 531; 89 *Id.* 534; 90 *Id.* 23.

7. The crossing and approaches were defective and the presumption is against the company. 87 Ark. 531; 84 *Id.* 409. In towns increased vigilance is necessary. 87 *Id.* 184. As to negligence at crossings and contributory negligence and duty of trainmen see 96 Ark. 243; 94 *Id.* 246; 96 *Id.* 394. If the evidence is conflicting as to whether plaintiff looked and listened, the question is for a jury. 105 Ark. 180. Deceased had a right to rely to some extent on the trainmen giving the proper signals. 96 Ark. 338; 103 *Id.* 374. See also 97 Ark. 437; 95 *Id.* 190; 102 *Id.* 257; 103 *Id.* 374; 97 *Id.* 56; 98 *Id.* 222; 99 *Id.* 490; 154 U. S. 593; 182 *Id.* 576; 54 Miss. 387; 91 Am. St.

453; 55 L. R. A. 810; Ann. Cas. 1913, A. 49; 11 Ann. Cas. 111-113.

*W. F. Evans* and *W. J. Orr*, for appellee; *Ponder, Gibson & Ponder*, of counsel.

1. The duties of travelers at public crossings is well defined. The look-out statute is not involved. The only questions were negligence and contributory negligence. Vigilance and care are required of parties at crossings. 101 Ark. 321; 117 *Id.* 464; 99 *Id.* 170.

2. There is no dispute here. The accident could not have happened had Billingsley performed his duties. The injury resulted from his own wrongful acts and failure to perform his duties. 16 S. W. 169.

3. No case was made for a jury and the court properly directed a verdict. Cases *supra.*

HART, J., (after stating the facts). It is the contention of counsel for the plaintiff that the court erred in directing a verdict for the defendant. The court was of the opinion that, when the testimony was considered in the light most favorable to the plaintiff, it showed as a matter of law that Billingsley was guilty of contributory negligence. While the question is a very close one, under the facts and circumstances adduced in evidence, we think the court erred in not submitting that question to the jury. The evidence for the plaintiff shows that he was a drayman in the town of Hardy and that the team he drove was used to passing about trains. On the day of the accident, Billingsley was engaged in his usual occupation of hauling freight from the depot. On his return to the depot he stopped on Main Street to speak to his brother-in-law and another drayman. They testified that just after he left them they heard the passenger train, which was coming in from the west, whistle for the station, a mile away. The evidence shows that the street over which Billingsley was then driving was rocky, and the train in question was late. The jury might have inferred that Billingsley did not hear the train whistle for the station. Billingsley drove on down

Main Street something less than 250 feet and then turned
into a street extending south over the railroad tracks.
He was standing up in the wagon and drove down this
street south towards the railroad crossing at a fast trot.
He was going down grade all the way until he reached
the railroad crossing and a train coming in from the
west would also be running down grade.  For 150 feet
before Billingsley reached the railroad crossing, cinders
had been laid over the traveled road and had been packed
into the road so as to form a smooth and hard surface
so that vehicles rolling over it made very little noise.
The view of the traveler of trains approaching from
either direction was obstructed until he came around the
cars on the commercial track.  There was also a large
warehouse which obstructed the view of the traveler on
the west side of the crossing.  It is true the omission of
the engineer to give the statutory signals for the cross-
ing did not relieve Billingsley of the duty of looking
and listening for the approaching trains, yet they were
warnings which he had the right to rely upon in determin-
ing whether a train was approaching.  It is also true
that Billingsley could not relax his efforts to see and
hear approaching trains because his view was obstructed
by the warehouse and by the box cars, still under such
circumstances he must necessarily rely to a greater
degree upon his sense of hearing to discover the ap-
proach of a train and in doing this he doubtless listened
not only for the noise of an approaching train, but for
the statutory signals required to be given, warning trav-
elers of the approach of the train.  Under these cir-
cumstances the jury might have legitimately inferred
that Billingsley was not guilty of contributory negli-
gence in approaching the crossing at a trot.  After he had
passed the box cars and trains from either direction came
within his line of vision, the evidence shows that he first
looked towards the east and then towards the west as
if looking for an approaching train.  There was a freight
train on the passing track east of the crossing and the

passenger train was coming in from the west. The evidence also shows that this train was coming faster than usual, was running down grade, and was making very little noise. It is inferable from the evidence that Billingsley stopped his mules before they had gotten upon the main track, and that they became frightened at the rapidly approaching train of which they had had no previous warning, and on this account became uncontrollable and jumped across the main track dragging the wagon after them.

When all the attendant circumstances are considered in the light of each other, it can not be said as a matter of law that Billingsley was guilty of contributory negligence. Of course, it is well settled by the decisions of this court that a traveler along the highway attempting to cross a railroad track must look and listen for the approach of trains, and stop if necessary to do so, otherwise he is guilty of contributory negligence and can not recover damages on account of injuries resulting therefrom. It can not be said, however, in the present case that the undisputed evidence shows that Billingsley did not look and listen, and we think it was a question of fact for the jury to determine under all the facts and circumstances adduced in evidence whether the precautions which Billingsley exercised in that respect were sufficient to acquit him of a charge of negligence. We think the facts and circumstances adduced in evidence in this case bring it within the decision in *St. L., I. M. & S. R. Co. v. Stacks,* 97 Ark. 405, and that the circuit court erred in directing a verdict for the defendant. For that reason the judgment must be reversed and the cause remanded for a new trial.

WOOD and SMITH, JJ., dissent.